1

2

3

4

5

6

7

8

9

10

11

12

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

13  MARIA G. ALONZO,                           Case No.  1:14-cv-00460-SKO

14              Plaintiff,                     **ORDER AFFIRMING THE ALJ'S
                                               DECISION**

15       v.

16  CAROLYN W. COLVIN,
    Acting Commissioner of Social Security,

17
                Defendant.
18
                                        _____/
19

20                        **I.   INTRODUCTION**

21          Plaintiff Maria G. Alonzo ("Plaintiff") seeks judicial review of a final decision of the

22  Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application

23  for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (the

24  "Act").  42 U.S.C. §§ 1381-83.  The matter is currently before the Court on the parties' briefs,

25  which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States

26  Magistrate Judge.[1]

27

28  _____
    [1] The parties consented to the jurisdiction of a United States Magistrate Judge, and the matter was assigned for all
    purposes to Magistrate Judge Sheila K. Oberto.  (Docs 8, 11.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on July 24, 1960 (Administrative Record ("AR") 194), she completed the tenth grade, and has no vocational or technical certification or training.  (AR 42, 43.)

### A.      Procedural History

On November 15, 2007, Plaintiff filed her initial application for SSI alleging she had been disabled since November 1, 2007.  That application was denied, and a subsequent hearing was held before an Administrative Law Judge ("ALJ").  On May 7, 2010, an ALJ issued a decision finding Plaintiff suffered from severe impairments of Hepatitis C, asthma, and degenerative disc disease.  The ALJ determined Plaintiff's Hepatitis C disabled her under the Act from November 15, 2007, through July 1, 2009, while she was undergoing treatment.  (AR 130.)  When Plaintiff's treatment for Hepatitis C ended, however, the ALJ found the severity of Plaintiff's impairments decreased in terms of signs, symptoms and laboratory findings.  The ALJ found there was no evidence of injection treatments for Hepatitis C since July 2, 2009, and determined that beginning July 2, 2009, Plaintiff was not disabled.  Relying on testimony of a vocational expert, the ALJ concluded Plaintiff remained capable of performing work such as a bagger, Dictionary of Occupational Titles ("DOT") 920.687-018; garment sorter, DOT 222.687-014; and grader, DOT 529.665-010.  (AR 137).  That decision was not challenged, and it became final.  20 C.F.R. § 404.905.

Plaintiff filed a new application for SSI on August 27, 2010, alleging disability beginning on July 3, 2009, due to a back injury, carpal tunnel syndrome ("CTS") in her wrists, arthritis, neck and shoulder pain, high blood pressure, and depression.  (AR 234.)

### B.      Relevant Evidence

In February 2010, Plaintiff underwent magnetic resonance imaging ("MRI") scans of her lumbar and cervical spines.  (AR 294-97.)  The MRI of her lumbar spine showed "[d]egenerative disc disease and facet degenerative changes identified with moderate to severe spinal canal stenosis at the L4-L5 level.  Bilateral neural foraminal narrowing at the L4-L5 level contacting the L4 nerve root."  (AR 294.)  The cervical MRI showed "[d]isc ridge complexes, unconvertebral osteophyte caus[ing] mild spinal canal stenosis . . . with neural foraminal narrowing.  No spinal

cord signal abnormality seen.  Some straightening of the cervical spine seen with reversal of the physiological curvature again identified centered on the 4-5 vertebra."  (AR 296-97.)

On February 11, 2011, Plaintiff underwent a comprehensive orthopedic evaluation with Fariba Vesali, M.D. (AR 389-93.)  Plaintiff complained of back pain since she was 12 years old, which was constant, burning, and sharp.  (AR 389.)  Plaintiff had undergone physical therapy that aggravated the back pain, which starts at her neck and radiates to her lower back.  (AR 389.)  Lying down, standing, and walking aggravate the pain, and nothing helps it subside.  (AR 389.)  She also reported undergoing bilateral carpal tunnel releases in the 1990s, but states that her hand cramps are back again.  Cooking and stirring aggravate the pain, while the pain medication provides pain relief.  (AR 389.)

On examination, Dr. Vesali noted Plaintiff had "no particularly abnormal gait," the Romberg[2] and Tandem tests were negative, but she deferred walking on her toes and heels due to back pain. (AR 391.)  Plaintiff arrived at the appointment with an assistive walker prescribed in 2002, and reported she uses the walker for ambulation outside the house.  During the examination, however, she was able to walk slowly without the walker.  (AR 391.)  She exhibited normal muscle bulk and tone, her strength was 5 out of 5 in the upper and lower extremities, including grip strength.  (AR 392.)  In general findings, Dr. Vesali noted the following:

> The claimant is moaning and complaining that she is having pain all the time during the physical exam.  Spurling's, Speed's, and Phalen's tests are negative bilaterally.  Tinel's sign on carpal tunnels is negative bilaterally.  There are small scars on bilateral palms.  Axial compression test is positive.  Patrick test caused low back pain.  There is tenderness with superficial palpation of bilaterally upper and lower extremities and entire back.  There is pain on motion of all joints in bilateral upper and lower extremities.  No obvious inflammation in bilateral upper and lower extremities

(AR 392.)  Dr. Vesali offered the following functional assessment:

> The claimant complains of tenderness with superficial and hardly touching the entire body.  There is no obvious inflammation in bilateral upper and lower extremities.  From my assessment of the claimant, I do not feel the condition will

---

[2] "The Romberg sign demonstrates loss of postural control in the absence of visual input suggestive of proprioceptive deficit in the lower limbs.  When the patient sways or falls with eyes closed while standing with feet together, it is considered to be positive.  A positive Romberg's test has been linked to all causes of proprioceptive deficits, including myelopathies of many causes, tabes dorsalis and sensory neuropathies."  Findlay, Gordon F. G., et al., Does Walking Change the Romberg Sign?, 18 European Spine Journal, pp. 1528-1531 (October 2009).

impose limitations for 12 continuous months.  For better evaluation of claimant's functional status, would consider reviewing imaging studies of thoracic and lumbosacral spine.

(AR 392.)  Dr. Vesali opined Plaintiff had no limitation in her ability to stand, walk, or sit; no assistive device was necessary; she could lift up to 50 pounds occasionally, and 25 pounds frequently; she could frequently climb, balance, stoop, kneel, crouch, and crawl; she had no manipulative limitations or workplace environmental activity limitations.  (AR 392-93.)

On February 19, 2011, Plaintiff underwent a comprehensive psychological evaluation with Rachel Latter, Ph.D.  (AR 382-88.)  Dr. Latter observed that Plaintiff arrived on time for her examination, she was dressed neatly and appropriately; she utilized a walker to help her ambulate; and appeared in significant pain throughout the interview.  (AR 382.)  Plaintiff reported a long history of symptoms related to depression since the age of seven, which come and go and typically last between one and two months.  (AR 383.)  Plaintiff also reported a history of suicidal thoughts and multiple suicide attempts.  She stated she did not feel like being closed in and had difficulty in small spaces due to her brother locking her in the closet for extended periods of time.  She also reported experiencing poor sleep and poor appetite during the depressive episodes.  (AR 383.)

Plaintiff first began psychiatric treatment in about 1967 that she attended "off and on" but could not recall the details of her visits.  She experienced multiple overdoses in the past that were suicide attempts for which she was hospitalized.  In 2002, she was hospitalized medically as well as for a psychological overdose.   After this particular overdose, she was in a coma for approximately one week.  (AR 383.)

She denied any current suicidal ideation or thoughts, plans, or intentions of harming herself.  She admitted to drinking alcohol on the weekends, and reported cocaine use for three months in 2002.  She admitted to having an alcohol problem and illegal drug use in the past, but denied any problems currently.  (AR 385.)  Following an examination, Dr. Latter provided the following discussion/prognosis:

> The claimant appeared to respond to questions in an exaggerated manner.  There did appear to be inconsistencies throughout the evaluation, especially in regard to the written information, being different from the information disclosed during the interview.

> At any rate, due to the reported symptoms and history, it does appear that she is suffering from a major mental illness.  Her limitations appear to be due to her medical, as well as psychological problems.
>
> The likelihood of her condition improving in the next 12 months is poor, due to chronic symptoms, even with medications.

(AR 387.)

Functionally, Dr. Latter concluded Plaintiff is not capable of managing her own funds due to poor calculating abilities and a poor ability to concentrate; she has the ability to understand, remember and carry out short, simple and repetitive tasks; an impaired ability to carry out detailed or complex tasks; a poor ability to interact with coworkers, supervisors, and the public; and she is not able to accept instructions and supervision from an employer and respond independently and appropriately.  Plaintiff's ability to sustain an ordinary routine without special supervision is poor from a psychiatric standpoint as is her ability to complete a normal workday and workweek without interruptions; she is not able to maintain regular attendance in the workplace; her ability to handle routine stressors is poor; and there is a likelihood she will emotionally deteriorate in a work environment due to stress.  (AR 388.)

On March 9, 2011, Plaintiff saw Chunxia Li, M.D., and was prescribed a "Summit Brace" for her chronic lower back pain and lumbar stenosis.  (AR 400-01.)  On that same day, state agency physician L. DeSouza, M.D., reviewed Plaintiff's medical records and completed a physical residual functional capacity assessment.  (AR 394-99.)  Dr. DeSouza opined Plaintiff was frequently able to lift and/or carry up to 10 pounds and occasionally lift and/or carry up to 20 pounds; stand or walk about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climb ramps and stairs, balance, and crawl; occasionally climb ladders, ropes, and scaffolds, kneel, and crouch; and has no manipulative limitations.  (AR 394-99.)  Dr. DeSouza opined Plaintiff could perform light work with only occasional postural activities.  (AR 399.)

On March 25, 2011, state agency physician Kim Morris, PsyD, reviewed Plaintiff's records and completed a psychiatric review technique form (AR 402-12) and a mental residual functional

1    capacity assessment.   (AR 413-15.)   Dr. Morris opined Plaintiff is able to complete simple

2    repetitive tasks with no public contact.  (AR 412.)

3        In March 2011, Plaintiff sought treatment at Neurosurgical Services at Community

4    Medical Center where she was treated by Brian H. Clague, M.D.  (AR 451.)   Although she

5    demonstrated no specific neurological findings on examination, Dr. Clague noted her February

6    2010 MRI showed stenosis at the L4 level.   It was recommended Plaintiff obtain an epidural

7    steroid injection, which she underwent on April 5, 2011.  (AR 451, 456.)  In June 2011, Plaintiff

8    was seen by Dr. Clague to follow up on her lower back pain.  (AR 447.)  She was assessed with

9    L4 stenosis with back and leg pains.  (AR 451.)    Dr. Clague recommended Plaintiff obtain a

10   second epidural, continue with the brace, start neck exercises, and obtain a neck pillow.  (AR 451.)

11       In September 2011, Plaintiff was against seen by Dr. Clague who noted that she had

12   undergone two lumbar injections which had provided some relief and recommended Plaintiff

13   undergo a third lumbar epidural.  (AR 429.)  Plaintiff presented with her brace and a walker; her

14   strength in her upper and lower extremities was noted to be good.  (AR 429.)  Plaintiff complained

15   that her neck was feeling as painful as her back, and a cervical MRI was ordered.  (AR 429.)

16       On September 15, 2011, Plaintiff was examined by Amanpal Gill, M.D., for medication

17   refills.  (AR 434.)  Dr. Gill reported Plaintiff's asthma and depression were well controlled, and

18   she was continued on a low-salt died for her blood pressure.  (AR 435.)  On October 9, 2011, the

19   cervical MRI revealed Plaintiff had broad-based bulges at C4-C5, C5-C6, and C6-C7, as well as a

20   right central disc protrusion at C3-C4 and extruded disc material at C5-C6.  (AR 461.)   Upon

21   review of the MRI report, Dr. Clague completed a questionnaire regarding Plaintiff's functional

22   abilities.  (AR 459-460.)  Dr. Clague opined Plaintiff was precluded from performing full-time

23   work at any exertional level, including at the sedentary level.  (AR 459-60.)  He listed her primary

24   impairment as cervical degenerative disc disease, CTS, and lumbar stenosis at L4.  (AR 459.)  He

25   opined she could not sit, stand, or walk for an hour in an eight-hour workday.  (AR 459.)  Dr.

26   Clague based his opinion on Plaintiff's February 2010 lumbar MRI showing stenosis at L4-L5.

27   (AR 459.)  He also opined Plaintiff would be unable to perform any reaching, handling, feeling,

28

1  pushing/pulling, or grasping with her hands due to her CTS.  (AR 459-60.)  Dr. Clague noted

2  Plaintiff's CTS diagnosis was associated with her foraminal stenosis at C5-6.  (AR 459.)

3       In December 2011, Plaintiff was seen again by Dr. Clague; he noted Plaintiff had been

4  examined by Dr. Jata who felt she needed a current lumbar MRI, which Dr. Clague indicated he

5  would order.  (AR 566.)  Dr. Clague also reported Dr. Jata had determined Plaintiff was "non-

6  surgical," and she was to be discharged from the neurosurgery clinic and returned to primary care.

7  (AR 566.)  A lumbar MRI was ordered, but the results are not in the record.  (AR 566.)  No further

8  treatment recommendations regarding her CTS or cervical MRI results were made by Dr. Clague.

9       In January 2012, Dr. Gill completed a form regarding Plaintiff's eligibility for general

10  relief from the County of Fresno.  (AR 226.)  Dr. Gill checked a box indicating Plaintiff could

11  perform limited part-time work but no full time work due to her lumbar back pain.  (AR 226.)  Dr.

12  Gill noted Plaintiff was unable to do any driving or work requiring climbing ladders or use of

13  power equipment, no repetitive bending or lifting, no repetitive hand movements, and limited

14  interaction with the public.  (AR 226.)  Dr. Gill limited the duration of Plaintiff's condition to six

15  months.  (AR 227.)

16       On June 11, 2012, Plaintiff was seen by Dr. Gill for complaints of left-sided chest pain

17  with shortness of breath that radiated down her left arm.  (AR 526.)    In assessing her condition,

18  he noted that Plaintiff was negative for any psychological or behavior symptoms.  (AR 509).

19  Plaintiff was placed under 24-hour observation, she became stable, and her pain resolved.  (AR

20  502-09.)  During her admission to the emergency room, it was noted she had no suicidal ideation,

21  and her mood, behavior, judgment, and thought content were all normal.  (AR 504.)

22       On July 6, 2012, Plaintiff was seen by Christopher Nerantzinis, M.D., a family

23  practitioner, for medication refills and to follow-up on her admission to the emergency department

24  for angina and diabetes.  (AR 493-500.)  Dr. Nerantzinis also completed a Fresno County general

25  relief form and indicated Plaintiff was unable to work at all due to chronic pain and

26  claustrophobia.  (AR 223.)

27       In August 2012, Dr. Nerantzinis completed a questionnaire regarding Plaintiff's functional

28  abilities.  (AR 595-56.)  He opined that Plaintiff was precluded from any full-time work at any

exertional level.  (AR 595.)  Plaintiff's primary diagnoses were listed as cervical disc disease, CTS, and lumbar stenosis.  (AR 595.)  He opined she could do no reaching, handling, feeling, pushing/pulling, or grasping.  (AR 596.)[3]

## C.    Third-Party Lay Testimony

On December 26, 2010, Plaintiff's niece, Sarita Sanchez, completed an adult function report form.  (AR 253.)  She noted Plaintiff cannot do much because she is always in pain. Plaintiff cannot hold her arms up for long because her shoulders and arms are always hurting. (AR 253.)  Ms. Sanchez visits Plaintiff on the weekends and assists her in running errands during the week.  (AR 253.)  As to Plaintiff's ability to perform yard work or household chores, Ms. Sanchez indicated Plaintiff could only do one thing per day because she needed to take a lot of breaks, and it takes her all day to perform chores because of her pain.  (AR 255.)  When Plaintiff goes out, she walks or uses public transportation, but she does not go out alone – her niece accompanies her.  (AR 256.)  Plaintiff becomes confused with money and requires assistance in that regard.  (AR 256-57.)  Plaintiff can carry no more than five pounds; she cannot bend or lift because of her back; and she is forgetful and cannot complete paperwork because she becomes confused.  (AR 258.)  She can walk no more than half a block, but she needs to rest for five to ten minutes; she cannot pay attention; and she is unable to follow instructions or "comprehend." (AR 258.)

## D.    Administrative Proceedings

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 143-47, 151-56, 159-61.)  On September 6, 2012, the ALJ held a hearing.  (AR 39-67.) Plaintiff testified, with the assistance of counsel, and a vocational expert also gave testimony. (AR 39-67.)

---

[3] The form Dr. Nerantzinis completed was identical to the form completed by Dr. Clague, and it lists the same findings as Dr. Clague, nearly verbatim.  (*Compare* AR 459-60 (form completed by Dr. Clague) *with* AR 595-96 (form completed by Dr. Nerantzinis).)

1        **1.       Plaintiff's Hearing Testimony**

2        Plaintiff testified that she was born on July 24, 1960, she is 5'1 inches tall, weighs 210

3   pounds, and is right handed.  (AR 42.)  She is divorced, lives alone, and receives general relief.

4   (AR 43.)  She does not have a driver's license, and she gets around to her appointments by walking

5   or taking the bus.  (AR 43.)  She has a 10th grade education, and she has never taken any

6   vocational classes.  (AR 43.)

7        As for her daily activities, Plaintiff needs help with showering and dressing.  She does "a

8   little" cooking and microwaving, some shopping and laundry, but no social activities like church

9   or visiting with friends.  (AR 44.)  On a typical day, she washes her face, brushes her teeth, gets

10  dressed, makes her bed, and does "whatever [she] can do."  (AR 44.)  She also watches television

11  and takes naps that last about a half hour.  (AR 45.)

12       Regarding her medical issues, Plaintiff has "deterioration" in her neck and whole back

13  which causes pain that "feels like electricity."  (AR 46.)  The pain is constant, and activities such

14  as cooking, cleaning, vacuuming, sitting, standing, and walking all make it worse.  (AR 46.)  No

15  position is comfortable.  Although she had a steroid injection in the past, it helped for only

16  "[a]bout an hour."  (AR 47.)  Pain medication only provides relief for approximately three hours,

17  and her physicians have "denied [her] surgery."  (AR 47.)  She also believes she has a bleeding

18  ulcer, and her blood pressure is "not good."  (AR 48.)  She was prescribed a walker in 2000 and

19  has been using it since that time.  (AR 57.)

20       She takes medication for asthma and high blood sugar which "goes up to 500," but she has

21  only been told to watch her diet and take her medication.  (AR 49.)  She cannot afford the

22  recommended diet for her diabetes, however.  (AR 59.)  For her CTS, she wears splints on her

23  wrists when she goes to bed or when she is sitting down relaxing.  (AR 49.)   She also has

24  Hepatitis C from a blood transfusion (AR 53), for which she was prescribed treatment.  She has

25  been told nothing about her Hepatitis following treatment, but they check her every three years.

26  (AR 50.)  She has problems with her memory, which has gotten worse in the last few years.

27  (AR 54.)  She has pain "down from [her] heart, so she takes "heart medication."  (AR 55.)  She

28  also suffers fatigue such that she wakes up tired.  She is unable to hold a cup in one hand – she

1  must use two hands to properly grasp it.  (AR 55.)  The longest she can use her hands is 20

2  minutes before needing a rest.  (AR 45.)

3      She believes she can only lift or carry about 5 pounds; sit for about 45 minutes before

4  having to get up and walk; stand for about 20 minutes; and walk only about a half a block.

5  (AR 51.)  If she drops something on the floor she simply leaves it there due to back pain.  (AR

6  52.)  She does not climb stairs, can she cannot hang onto a cup due to her CTS.

7      Regarding her depression, she does not know how it affects her, she just gets depressed.

8  She cannot pay attention to the television when she watches it, but she can manage her own

9  finances.  (AR 52.)  She keeps to herself in terms of social interaction.  (AR 52.)  She takes Zoloft

10  for her depression which helps "once in a while."  (AR 53.)

11     She had worked full time in the past as a cook.  (AR 46.)  She received Social Security

12  benefits in the 1980s, but the benefits stopped when she went back to work.  (AR 54.)

13     **2.     Vocational Expert's Hearing Testimony**

14     The ALJ posed hypotheticals for a Vocational Expert ("VE") to consider at the hearing.

15  The ALJ asked the VE to consider a hypothetical person of the same age and education as Plaintiff

16  and with the same work history who is limited to lifting and carrying 20 pounds occasionally, and

17  10 pounds frequently; sitting, standing, and/or walking six to eight hours with only occasional

18  stooping, crouching, crawling, kneeling; a need to avoid concentrated exposure to dust, gasses,

19  and fumes, and poor ventilation.  (AR 63.)  The VE testified such an individual could not perform

20  Plaintiff's past work, but could perform work as a packing line worker, garment sorter, and hand

21  fuel filler.  (AR 63.)

22     The ALJ posed a second hypothetical assuming the same limitations as the first, but added

23  a limitation for simple, routine tasks.  The VE testified Plaintiff could perform the jobs identified

24  in response to the first hypothetical as those were all light, unskilled, and with an SVP of 2.

25  (AR 63.)

26     The ALJ posed a third hypothetical with all the limitations of the first and second

27  hypotheticals and adding a need to take an additional two to four breaks of 30 minutes per day.

28  (AR 63.)  The VE testified there would be no work for such an individual.  (AR 64.)

1    Plaintiff's counsel also posed one hypothetical to the VE asking the VE to presume all the

2  limitations of the first two hypotheticals with the added limitation for only occasional use of the

3  person's hands.  (AR 64.)  The VE testified this would foreclose the world of work.  (AR 64.)

4        **3.      ALJ's Decision**

5    On September 18, 2012, the ALJ issued a decision finding Plaintiff not disabled.  (AR 22-

6  32.)  The ALJ determined Plaintiff has the Residual Functional Capacity ("RFC")[4] to lift and carry

7  20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk for six hours in an eight-

8  hour day; can occasionally stoop, crouch, crawl, and kneel; and she must avoid concentrated

9  exposure to dust, gases, fumes, and poor ventilation.  (AR 26.)

10    The ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since

11  August 27, 2010, the date of her application; (2) has the following severe impairments or

12  combination of impairments:  lumbar and cervical degenerative disc disease, obesity, asthma, and

13  fibromyalgia; (3) does not have an impairment or combination of impairments that meets or

14  medically equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1;

15  (4) is unable to perform her past relevant work; but (5) she is able to perform alternative work that

16  exists in significant numbers in the national economy.  (AR 22-32.)

17    Plaintiff sought review of the ALJ's decision before the Appeals Council.  (AR 17-18.)  On

18  January 28, 2014, the Appeals Council denied review.  (AR 1-7.)  Therefore, the ALJ's decision

19  became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

20  **E.      Plaintiff's Contention on Appeal**

21    Plaintiff contends the ALJ erred in finding Plaintiff's mental condition was not severe,

22  failed to adequately assess the medical evidence in formulating Plaintiff's RFC, and failed to

23  properly weigh Plaintiff's lay statements and other lay-witness testimony.

24

25  ───────────────

26  [4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an

27  individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and

28  'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1

### III.   SCOPE OF REVIEW

2    The ALJ's decision denying benefits "will be disturbed only if that decision is not

3 supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,

4 601 (9th Cir. 1999).   In reviewing the Commissioner's decision, the Court may not substitute its

5 judgment for that of the Commissioner.   *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

6 Instead, the Court must determine whether the Commissioner applied the proper legal standards

7 and whether substantial evidence exists in the record to support the Commissioner's findings.   *See*

8 *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

9    "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.*

10 *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).   "Substantial evidence" means "such

11 relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

12 *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

13 305 U.S. 197, 229 (1938)).   The Court "must consider the entire record as a whole, weighing both

14 the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

15 may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*

16 *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

17

### IV.   APPLICABLE LAW

18    An individual is considered disabled for purposes of disability benefits if he is unable to

19 engage in any substantial, gainful activity by reason of any medically determinable physical or

20 mental impairment that can be expected to result in death or that has lasted, or can be expected to

21 last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

22 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

23 impairments must result from anatomical, physiological, or psychological abnormalities that are

24 demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

25 such severity that the claimant is not only unable to do his previous work, but cannot, considering

26 his age, education, and work experience, engage in any other kind of substantial, gainful work that

27 exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

28

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.   20 C.F.R. §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.   20 C.F.R. §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work.   20 C.F.R. §§ 404.1520(f), 416.920(f).   If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.   20 C.F.R. §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

### A.      The ALJ Did Not Err in Finding Plaintiff's Mental Impairment Was Not Severe

In concluding her depression caused only mild limitation and was not severe, Plaintiff argues the ALJ failed to indicate any medical opinion that supported this finding.   Instead, the ALJ's finding is contradicted by the opinion of Dr. Latter, the only examining or treating physician who offered an opinion about Plaintiff's mental functioning.   According to Plaintiff, the ALJ improperly rejected Dr. Latter's opinion, and in the absence of any other medical opinion concluding Plaintiff's depression was *not* severe, the ALJ's finding was unsupported by any medical evidence.

The Commissioner asserts the ALJ properly rejected the opinion of Dr. Latter and found Plaintiff's mental condition non-severe.   The ALJ found Dr. Latter's opinion inconsistent with the

1  medical record and gave Dr. Morris' opinion that Plaintiff was able to perform simple work with

2  limited public contact little weight because the record did not support the opinion.

3      Because the ALJ resolved the Second Step in Plaintiff's favor and continued the sequential

4  evaluation, any error in finding Plaintiff's depression "not severe" at the Second Step is only

5  harmful error if the ALJ failed to properly consider the limitations stemming from Plaintiff's

6  mental impairment at later steps of the analysis.  *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th

7  Cir. 2005).  This is so because the ALJ is required to consider *all* limitations and restrictions

8  imposed by all impairments, even those deemed not severe, at all the later steps of the sequential

9  evaluation process.  Social Security Ruling ("SSR") 96-8p, 1996 WL 362207, at *34477 (July 2,

10  1996) (requiring ALJ's RFC assessment to "consider limitations and restrictions imposed by all of

11  an individual's impairments, even those that are not 'severe'").

12      The ALJ considered Dr. Latter's opinion about Plaintiff's limitations stemming from her

13  depressive disorder at the Fourth Step of the sequential evaluation and rejected it.  Dr. Latter

14  opined Plaintiff's "Major Depressive Disorder" would prevent her from maintaining regular

15  attendance in the workplace, and she concluded Plaintiff's ability to interact with co-workers,

16  supervisors, and the public was "poor."  (AR 387.)  Dr. Latter also indicated Plaintiff's ability to

17  handle routine stressors made it likely she would emotionally deteriorate in a work environment.

18  (AR 388.)

19      The ALJ gave Dr. Latter's opinion little weight because it was inconsistent with the

20  medical record as Plaintiff's mental status examinations were generally "normal," Plaintiff had not

21  received specialized mental health treatment which diminished her credibility, and Plaintiff

22  engaged in a wide variety of activities inconsistent with Dr. Latter's opinion of her mental

23  functional abilities.  (AR 28.)

24      **1.      Dr. Latter's Opinion Was Found Inconsistent with the Medical Record**

25      Plaintiff argues the ALJ's finding that Dr. Latter's opinion is inconsistent with the medical

26  record is flawed for several reasons.  The mental status examination Dr. Latter performed revealed

27  deficits in a number of areas, and cannot be considered "generally normal."  Moreover, the other

28  mental status examinations referred to by the ALJ were not performed by a psychiatrist or a

1   psychologist, but were a brief part of physical examinations performed by various physicians.

2   Plaintiff also contends a mental status examination gauges only an individual's cognitive function,

3   which is not a condition Plaintiff has alleged.

4        The ALJ is entitled to consider the consistency of a physician's opinion with the rest of the

5   record. *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).   Here, the ALJ compared Dr. Latter's

6   opinion against other mental status notations made by Plaintiff's treating physicians.   Specifically,

7   in February 2011, Plaintiff was examined at Community Medical Centers ("Community"), and it

8   was noted her depression was stable.   (AR 585.)   At another examination in August 2011, it was

9   noted Plaintiff exhibited a normal mood and affect.   (AR 435.)   In June 2012, Plaintiff was again

10  examined at Community and psychiatric indicators were assessed.   (AR 504.)   The physician

11  noted Plaintiff had a normal mood and affect, her behavior was normal, and her judgment and

12  thought content were normal.   (AR 504.)   The fact that Plaintiff did not present to her treating

13  physicians with acute depressive symptoms on several occasions over the course of several years

14  is evidence the ALJ was entitled to consider and weigh against Dr. Latter's opinion that Plaintiff

15  would not be able to maintain regular attendance, handle stress, and would likely deteriorate in a

16  working environment.   Plaintiff's argument that these treating-physician notations were not

17  rendered by a psychologist or psychiatrist and as such must be given diminished weight as

18  compared to Dr. Latter's assessment is not persuasive.   The fact that Plaintiff was not reporting

19  severe depressive symptoms to her treating physicians during regular examinations over the course

20  of years tends to show Plaintiff's symptoms were not as severe as Dr. Latter opined, and the

21  evidence is relevant and probative on that basis.   The ALJ did not err in considering this evidence

22  and finding it inconsistent with Dr. Latter's opinion of Plaintiff's mental limitations.

23       Plaintiff's argument that the "mental status" notations only gauged her cognitive function

24  rather than her emotionally functioning is incorrect.   Plaintiff's treating physicians prescribed her

25  Zoloft to treat her depression and she was noted to have a history of suicide attempts.   Her

26  physicians were aware of Plaintiff's particular psychological impairments, and there is simply no

27  evidence their notations of her psychological functioning was not related to her depression for

28  which she was prescribed medication by these physicians.

The ALJ was entitled to consider Dr. Latter's examination and compare it to the treating physicians' notes of Plaintiff's mental condition over the course of her years of treatment.

**2.      Plaintiff's Daily Activities Were Found Inconsistent with Dr. Latter's Opinion**

The ALJ also considered the scope of Plaintiff's daily activities which were found to be inconsistent with Dr. Latter's assessment.  Plaintiff argues the ALJ was required to set out the activities the ALJ deemed inconsistent with Dr. Latter's opinion, but the ALJ did not do so. Plaintiff also argues her activities were limited to leaving the house for medical appointments and shopping, which do not establish Plaintiff is able to function in a competitive work environment. Even if the ALJ had linked Plaintiff's actual activities found to be inconsistent with Dr. Latter's assessment, there was no legitimate basis to reject Dr. Latter's opinion on this ground.

Here, the ALJ reasoned only that Plaintiff engaged "in a wide variety of daily activities inconsistent with allegations of total disability."  (AR 28.)  This is not specific to Dr. Latter's opinion or what activities Plaintiff engaged in that undercut Dr. Latter's opinion.  Plaintiff's ability to care for her personal needs and take care of her dogs may be probative of her physical abilities, but it says little about her depressive symptoms and whether she could maintain attendance at work or maintain appropriate contact with people such as supervisors and co-workers or the general public.  As articulated by the ALJ, this is not a specific and legitimate basis to reject Dr. Latter's opinion.  Nonetheless, any error in considering Plaintiff's daily activities is harmless because the ALJ stated other specific and legitimate reasons to discount Dr. Latter's opinion.

**3.      Plaintiff's Credibility Weighed Against Dr. Latter's Opinion**

Plaintiff's credibility was a factor the ALJ considered in giving Dr. Latter's opinion less weight.  While the ALJ noted Plaintiff had not sought any specialized mental health treatment other than the prescription medication she received from her treating providers, the ALJ also noted that Dr. Latter indicated Plaintiff's statements during examination were exaggerated and inconsistent.  (AR 30.)  Dr. Latter nonetheless accepted Plaintiff's statements about her depressive symptoms and history at face value and assessed Plaintiff on that basis.  Dr. Latter's examination was predicated almost entirely on Plaintiff's statements about her pain and limitations.  Assessing

the weight to afford Dr. Latter's opinion hinges strongly on the degree of Plaintiff's accuracy and veracity in reporting her symptoms.  It is evident from the ALJ's decision that Plaintiff's credibility was a factor the ALJ considered in assessing Dr. Latter's opinion, which was appropriate. *Brawner v. Sec'y of Health & Human Servs,*, 839 F.2d 432, 434 (9th Cir. 1988) (where claimant's credibility is undermined, it is "reasonable to question the reliability of a physician's opinion based only upon [the claimant's] complaints").

In *Ryan v. Commission of Social Security*, the court held an ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not question those complaints and supports the ultimate opinion with personal observations.  528 F.3d 1194, 1199-1200 (9th Cir. 2008).  *Ryan*, however, is distinguishable from this case for two reasons.  First, Dr. Latter herself questioned the credibility of Plaintiff's statements during her examination by noting Plaintiff's tendency to exaggerate and provide inconsistent responses.  Although Dr. Latter did not expressly determine Plaintiff was malingering, she nonetheless explicitly questioned the veracity of Plaintiff's statements regarding her conditions.  This is not a case where Plaintiff's credibility is doubted only by the ALJ – the examiner noted concerns about the accuracy of Plaintiff's reporting.  Second, Dr. Latter's opinion was controverted in important respects by the state-agency reviewing physician, Dr. Morris.  Unlike *Ryan*, the ALJ here was required to state specific and legitimate reasons to reject Dr. Latter's opinion, not clear and convincing reasons.  Plaintiff's credibility was an important factor in assigning weight to Dr. Latter's assessment.

In discussing Dr. Latter's opinion, the ALJ noted Plaintiff's credibility was diminished by her failure to seek specialized mental health treatment, and did not emphasize in that section of the decision the nature of Plaintiff's statements during her evaluation with Dr. Latter.  Nonetheless, in considering Plaintiff's credibility, the ALJ expressly referred to Dr. Latter's notation of Plaintiff's exaggerations and inconsistences.  The Court cannot ignore the ALJ's finding in this regard, particularly where Plaintiff's credibility was an express basis for rejecting Dr. Latter's opinion – an opinion that was predicted almost entirely on Plaintiff's own statements of her symptoms and their severity.  *See Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) ("As a reviewing court, we

1   are not deprived of our faculties from drawing specific and legitimate inferences from the ALJ's

2   opinion.").  Nor does considering this portion of the ALJ's credibility analysis in conjunction with

3   the ALJ's consideration of Dr. Latter's opinion violate the proscription against a reviewing court

4   considering reasons to support an ALJ's finding *not* set forth by the ALJ in the first instance.

5   *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).  Here, the ALJ rejected Plaintiff's lay

6   statements, cited Dr. Latter's express notation regarding Plaintiff's exaggeration and

7   inconsistencies in her statements at the examination, and rejected Dr. Latter's opinion based on

8   Plaintiff's lack of credibility.  Considering the ALJ's credibility assessment in conjunction with the

9   ALJ's assessment of Dr. Latter's opinion is supported by a synthesis of the Ninth Circuit's holdings

10  in *Magallanes*, 881 F.2d at 755 (proper for the court to read the ALJ's paragraph discussing one

11  doctor and draw inferences relevant to the ALJ's consideration of another doctor) and *Burrell*, 775

12  F.3d at 1138 (reviewing court "may not take a general finding . . . and comb the administrative

13  record to find specific conflicts").

14       The ALJ also noted Plaintiff's credibility about her depressive symptoms was undermined

15  by Plaintiff's failure to seek specialized mental health treatment.  This credibility consideration is

16  also relevant and legitimate in considering Dr. Latter's opinion.  Plaintiff sought some mental

17  health treatment through physicians providing her with other medical care:  she was prescribed

18  Zoloft (or Sertraline) that treating physicians noted had stabilized her depression.  (AR 320, 335.)

19  If the prescriptive care she was receiving was not effective in managing her depressive symptoms,

20  there is a question why Plaintiff did not seek additional or specialized mental health treatment

21  given the severity of symptoms alleged, *e.g.,* past suicide attempts and a lifelong history of

22  depressive episodes.  Although Plaintiff argues it is inappropriate for an ALJ to make any

23  assumptions about why a person with a mental health issue does not seek treatment (citing *Nguyen*

24  *v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)), here Plaintiff did seek mental treatment from her

25  physicians in the form of anti-depressant medication, but claims to continue having a disabling

26  level of symptoms.  If Plaintiff's symptoms were as severe as alleged, it is a rational inference that

27  she would have sought additional and specialized treatment for her depressive episodes.  This was

28  a legitimate and specific basis to doubt Plaintiff's statements about the degree of her depressive

symptoms and to assign less weight to Dr. Latter's opinion based upon Plaintiff's own statements. *See Orn*, 495 F.3d at 638 (unexplained failure to seek medical treatment may be relied upon in finding Plaintiff's complaints unjustified or exaggerated).

**4.    Remaining Medical Evidence**

Dr. Morris reviewed Dr. Latter's opinion and agreed only that Plaintiff could not interact with the public.  The ALJ gave this opinion little weight for the same reasons Dr. Latter's opinion was rejected.  (AR 30.)  Dr. Morris' opinion was predicated largely on Dr. Latter's examination findings and opinion.  For the reasons discussed above, the ALJ's reasons for rejecting these opinions were specific and legitimate.

Finally, Plaintiff maintains that if Dr. Latter's opinion was properly discounted, there is no medical evidence to substantiate the ALJ's finding that Plaintiff's depressive symptoms were not severe.  There is medical evidence, however, regarding Plaintiff's presentation of her depressive symptoms to her physicians who prescribed anti-depressive medication.  Her depression was noted to be stable at several examinations, and Plaintiff did not report any severe depressive symptomatology to her treating physicians.  (*See* AR 320, 335, 363, 504, 509.)  Also, it is not the ALJ's duty to develop additional evidence that Plaintiff's depression was *not* severe.  Instead, it is Plaintiff's duty to present evidence of functional limitation arising from her mental condition. 42 U.S.C. § 423(d)(5) (the Social Security Act places the burden of producing evidence proving the functional limitations that make up the claimant's RFC on the claimant).  If there is no credible evidence that Plaintiff's mental condition caused her more than mild functional limitation, there is no basis for the ALJ to develop more evidence to confirm that Plaintiff's condition is not severe. The treating records indicate Plaintiff's depression was stable on medication (AR 320, 335, 363), and the ALJ discounted Plaintiff's lay testimony about her mental limitations.  The ALJ was not required to develop further evidence to confirm Plaintiff did not have functional limitation due to her mental impairments.

In sum, the ALJ did not err in finding Plaintiff's depression was not a severe mental impairment, nor did the ALJ err in refusing to give controlling weight to the opinion of Dr. Latter.

**B.    The ALJ's assessment of Plaintiff's RFC**

1    Plaintiff contends the ALJ failed to give specific and legitimate reasons for rejecting the

2    opinions of Drs. Clague, Gill, and Nerantzinis, and the ALJ did not give adequate deference to any

3    of these treating physicians.  Plaintiff maintains the ALJ failed to consider the frequency of their

4    examinations or the nature and extent of their treating relationship with Plaintiff as required by

5    regulation.

6         The medical opinions of three types of medical sources are recognized in Social Security

7    cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not

8    treat the claimant (examining physicians); and (3) those who neither examine nor treat the

9    claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

10   Generally, a treating physician's opinion should be accorded more weight than opinions of doctors

11   who did not treat the claimant, and an examining physician's opinion is entitled to greater weight

12   than a non-examining physician's opinion.  *Id.*  Where a treating or examining physician's opinion

13   is uncontradicted by another doctor, the Commissioner must provide "clear and convincing"

14   reasons for rejecting the treating physician's ultimate conclusions.  *Id.*  If the treating or examining

15   doctor's medical opinion is contradicted by another doctor, the Commissioner must provide

16   "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be

17   supported by substantial evidence in the record.  *Id.* at 830-31; *accord Valentine v. Comm'r Soc.*

18   *Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).  The ALJ can meet this burden by setting out a

19   detailed and thorough summary of the facts and conflicting clinical evidence, stating his

20   interpretation thereof, and making findings.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir.

21   2008).

22        Plaintiff first argues the ALJ failed to acknowledge that Drs. Nerantzinis and Gill were

23   treating physicians whose opinions were entitled to deference.  (Doc. 15, 17:21-18:4.)  This is

24   incorrect.  The ALJ expressly recognized that Dr. Nerantzinis as Plaintiff's treating physician, and

25   although the ALJ did not explicitly name Dr. Gill, Dr. Gill's opinion and treatment notes were

26   cited and discussed.  (AR 30).  Plaintiff saw Dr. Gill at Community in August 2011 for medication

27   refills and an examination where she exhibited a full range of motion and had a normal mood and

28   affect (AR 434); in January 2012, Plaintiff saw Dr. Gill at Community to obtain medication refills

1   and asked that he fill out Fresno County general relief paper work, which he completed stating

2   Plaintiff was limited to part-time work and would be disabled for 6 months due to her lumbar disc

3   pain (AR 226-27, 550); in June 2012 she saw Dr. Gill a third time, and reported chest pain and

4   left-sided radiating pain.  (AR 526-27.)  Due to Plaintiff's presentation with chest pain, she was

5   referred to Community's emergency department.   (AR 527.)   These treatment notes from

6   Community as well as the Fresno County general relief forms completed by Dr. Gill were

7   reviewed by the ALJ.  Thus, Dr. Gill's treating status was known to the ALJ by virtue of the ALJ's

8   review of Dr. Gill's treating notes.

9       Plaintiff next argues the ALJ was required to expressly consider the length of her treating

10   physicians' relationships with her, the frequency of their examinations of her, the nature and extent

11   of their treating relationship, and whether the opinions were supported by medical evidence.  The

12   ALJ, however, did not expressly consider the first two factors and improperly assessed the third

13   factor – i.e., whether the opinions were supported by medical evidence.

14       While 20 C.F.R. § 404.1527, which Plaintiff cites, requires an ALJ to consider these

15   factors in assessing medical evidence presented by a claimant, there is no requirement that the ALJ

16   give *express* consideration to each of these factors in a hearing decision.  In reviewing Plaintiff's

17   medical records and considering the nature of her treatment, the ALJ necessarily considered

18   Plaintiff's examining and treatment relationship with her physicians, the frequency of the

19   treatment, and the length of the treatment relationship as all this data was contained in the medical

20   records reviewed by the ALJ.  This contention of error is unpersuasive.

21       Plaintiff also contends the ALJ improperly assessed whether Dr. Clague and Nerantzinis'

22   opinions were supported by the medical record.  Plaintiff asserts the ALJ did not address the MRI

23   results of Plaintiff's lumbar and cervical spine, and did not explain how or why Dr. Clague and Dr.

24   Nerantzinis' opinions were inconsistent with these findings.  Despite Plaintiff's contention, the

25   ALJ expressly considered Plaintiff's MRI results from 2010 and 2011.  The ALJ discussed

26   Plaintiff's October 2011 cervical MRI, noting there was moderate narrowing at C5-6 of the left

27   neural foramen and a suggestion of superimposed left central disc herniation with extruded disc

28   material.  (AR 29.)  The ALJ also noted Plaintiff's February 2010 cervical and lumbar MRIs.

1   (AR 27.)  Nonetheless, upon review of these MRI findings, Plaintiff was found to be non-surgical,

2   she was discharged from the neurosurgery clinic, and Dr. Clague made no further treatment

3   recommendations.  The ALJ also correctly noted Plaintiff did not have an updated lumbar MRI

4   before she was discharged from the neurosurgery clinic in December 2011.

5       Although Drs. Clague and Nerantzinis opined that Plaintiff was unable to sit, stand, or

6   walk during an eight-hour workday predicated on her 2010 lumbar MRI findings, the ALJ noted

7   this was inconsistent with the normal physical examination recorded by Dr. Vesali and Plaintiff's

8   treatment records since August 2010.  (AR 30.)  The clinical findings were minimal, and Plaintiff

9   was considered non-surgical.  Dr. Clague opined Plaintiff had limitation in her hands due to CTS,

10  her cervical MRI was consistent with the CTS diagnosis, and she could perform no reaching,

11  handling, feeling, pushing/pulling, or grasping.  (AR 459-60.)  But as to manipulative limitations

12  stemming from Plaintiff's CTS, the ALJ noted Plaintiff's 2009 EMG/nerve conduct tests were

13  negative and upon examination with Dr. Vesali, Plaintiff was able to perform several manipulative

14  functions with her hands such as zipping her coat, picking up a paperclip, and signing her name.

15  (AR 30.)  These were appropriate consideration in determining whether Dr. Clague's and Dr.

16  Nerantzinis' opinions that Plaintiff could perform no manipulative functions with her hands were

17  supported by the medical evidence.  Although Dr. Clague opined Plaintiff could perform no

18  walking, standing, or sitting due to her lumbar condition, no new lumbar MRIs are contained in

19  the record, and no further treatment was recommended.  Contrary to Plaintiff's assertion, the ALJ

20  acknowledged and discussed Plaintiff's MRIs as well as how Drs. Clague and Nerantzinis gave

21  opinions contrary to other medical evidence in the record.

22      Plaintiff argues the ALJ improperly relied on Dr. Vesali's examination results because Dr.

23  Vesali did not review Plaintiff's MRI results and opined that imaging studies would have to be

24  performed for better evaluation of Plaintiff's functional status.  Plaintiff contends that because Dr.

25  Vesali expressed the need for a more complete record, the ALJ erred by relying on Dr. Vesali's

26  opinion.  Dr. Vesali noted that for a "better evaluation of claimant's functional status, [Dr. Vesali]

27  would consider reviewing imaging studies of thoracic and lumbosacral spine."  (AR 392.)  This

28  was not a recommendation that more studies be performed or that Dr. Vesali was unable to render

1    an opinion without imaging results.  Dr. Vesali made clinical examination findings, which the ALJ

2    was entitled to consider.   State agency nonexamining physician Dr. DeSouza also reviewed

3    Plaintiff's records in March 2011, which included Plaintiff's 2010 cervical and lumbar MRIs, and

4    opined Plaintiff's exertional abilities were more limited than that opined by Dr. Vesali due to

5    review of the MRIs.  (AR 394-99.)  The ALJ adopted Dr. DeSouza's opinion in this regard, and

6    thus accounted for the fact Dr. Vesali had not reviewed MRI findings.

7        In citing the inconsistencies between Drs. Clague and Nerantzinis' opinions and the

8    treating record, the ALJ also noted Plaintiff's conditions were found to be well controlled with

9    medication.  Plaintiff testified at the hearing her medication gave her relief for three-hour blocks,

10   and she uses no other pain-relief methods such as heat or ice.  (AR 47.)  Plaintiff asserts the

11   treatment the ALJ referenced in conjunction with finding Plaintiff's pain well-controlled by

12   medication was a reference to her hypertension, which was found to be well controlled, not a

13   reference to her pain.  (AR 500.)  However, that note by Dr. Nerantzinis did refer to Plaintiff's

14   pain and indicated she was able to clean and take care of her household activities with her

15   methadone prescription, but was unable to do so without it.  (AR 499.)  This was the basis for

16   renewing the methadone prescription – it was helping control the pain.  (AR 499.)  Dr. Gill also

17   reported in January 2012 that Plaintiff's pain was well-controlled with medication.  (AR 554.)  If

18   the medication was *not* controlling Plaintiff's pain, it is a rational presumption that Plaintiff's

19   prescription for methadone would have been changed or discontinued.  Plaintiff was noted to be

20   on a pain contract with respect to her methadone prescription, and there is no reason to believe that

21   Plaintiff was prescribed a controlled substance if it was not useful or effective in controlling her

22   pain.

23       The ALJ also considered inconsistencies between Drs. Clague and Nerantzinis' opinions

24   and Plaintiff's daily activities.  Plaintiff argues her sporadic activities punctuated by rest do not

25   contradict her physicians' opinions that she cannot walk, stand, or sit in an 8-hour day or that she

26   is unable to use her hands for any reaching grasping, or pushing and pulling.  Yet, to Dr. Vesali,

27   Plaintiff reported she could go grocery shopping, perform some cooking, wash the dishes, and do

28   the laundry.  (AR 389.)  These activities all require a certain sustained measure of reaching and

grasping, undercutting the physicians' opinions of drastically reduced abilities in these areas. Plaintiff also reported at the hearing she lived alone in an apartment with her two dogs, and she maintained their care.  She did cooking, laundry, but denied the abilities to perform her personal care without help.  (AR 73-75.)  She also took the bus or walked to her medical appointments. (AR 43.)   The ALJ was entitled to consider the breath and scope of her physical activities.  While these activities may not be sustained for hours over the course of the day, they are nonetheless inconsistent with the physicians' opined limitations that she could *never* reach, grasp, or push and pull.  While the physicians stated she could do *no* walking, sitting, or standing in the course of an eight-hour day, she clearly performed these activities by walking or taking the bus to appointments, sitting for appointments, and performing household activities that require the use of her hands.  These are activities inconsistent with the extremely limited opinions of her functional abilities by her physicians.  While these may not be the kind of activities that are probative of Plaintiff's ability to work, they are clearly activities inconsistent with the physicians' opinions, and as such, are a legitimate and specific consideration in that context.

Plaintiff argues that because no doctors other than Drs. Clague and Nerantzinis reviewed Plaintiff's 2011 cervical MRI, the ALJ could not interpret the MRI findings in the absence of any physician's opinion.  Drs. Clague and Nerantzinis did not tie the 2011 cervical MRI findings to any particular limitations.  They indicated Plaintiff's CTS diagnosis was consistent with the cervical MRI, but not that anything in her cervical MRI caused a particular type of limitation. Moreover, the EMG/nerve condition results did not indicate CTS and neither physician recommended any further treatment for Plaintiff's CTS, despite both physicians' opinions that Plaintiff was extremely limited in the use of her hands.  Thus, the ALJ was not required to seek any additional medical information regarding the 2011 MRI results.

In sum, the ALJ's finding that the opinions of Plaintiff's treating physicians were not supported by the medical records and treating notes and are inconsistent with Plaintiff's daily activities are legitimate and specific reasons supported by substantial evidence to give these opinions less weight.

///

## C. The ALJ's Assessment of Plaintiff's Credibility

Plaintiff argues the ALJ's reasons for discrediting her lay testimony were not clear and convincing. The ALJ found Plaintiff's statements not fully credible:

> The claimant has a history of substance abuse and a criminal history. She has a poor work history. The claimant reported that she stopped working in 2002, but she reported alcohol and cocaine abuse in 2002. She reported to her doctor that she last used cocaine in 2002, when she had a myocardial infarction. (18F, p. 11). In June 2012, the claimant reported that she was currently drinking alcohol (Exhibit 18F, p. 11), which is inconsistent with her testimony that she does not drink alcohol. The claimant engages in a wide range of daily activities, and physical examinations have been generally normal (Exhibits 18F, p. 62; 12F, p. 13). The claimant gets around by walking and using public transportation (Exhibit 4E, p. 4). Dr. Latter noted that the claimant answered questions in an exaggerated manner and there were numerous inconsistencies in the claimant's statements (Exhibit 4E, p. 6).

(AR 29-30.)

### 1. Inconsistent Statements

One of the reasons the ALJ discredited Plaintiff's lay testimony was Plaintiff's inconsistent statements. An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

Although the ALJ noted Dr. Latter's observation of Plaintiff's exaggerated manner and inconsistencies, Plaintiff contends that Dr. Latter found Plaintiff's mental condition caused her to make inconsistent statements. This argument is unpersuasive. Dr. Latter made the following observation about Plaintiff's conduct during the course of the psychological evaluation:

> The claimant appeared to respond to questions in an exaggerated manner. There did appear to be inconsistencies throughout the evaluation, especially in regard to the written information being different from the information disclosed during the interview.

> At any rate, due to the reported symptoms and history, it does appear that she is suffering from a major mental illness. Her limitations appear to be due to her medical, as well as psychological problems.

(AR 387).   Dr. Latter did not find Plaintiff's inconsistent statements to be due to her mental condition; rather, Dr. Latter essentially stated she was able to formulate an opinion notwithstanding the exaggerated responses and inconsistent information.   Dr. Latter noted, for example, Plaintiff reported she drank alcoholic beverages on the weekends, but then denied alcohol consumption since 2003.   (AR 385).   The fact Plaintiff was observed to exaggerate and give inconsistent responses to questions with the psychological evaluator was a proper basis for the ALJ to question the candidness of Plaintiff's lay testimony.   *See Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (ALJ's consideration of claimant's tendency to exaggerate and "poor effort" given during a consultation examination sufficient to discredit a claimant's testimony).

Beyond the inconsistencies noted by Dr. Latter, the ALJ considered a specific inconsistency between Plaintiff's hearing testimony and a statement she made to her physician.   In June 2012, Plaintiff reported she was currently drinking alcohol, but contrarily stated at the hearing that she does not drink alcohol.   (*Compare* AR 503 (admitting to alcohol use in June 2012) *with* AR 53 (denying alcohol use for "[q]uite a few years" in September 2012).   These types of inconsistent statements comprised a clear and convincing reason to discount Plaintiff's credibility.

### 2.   Work History

The ALJ also considered Plaintiff's poor work history, which is a relevant factor in a credibility determination.   *Thomas*, 278 F.3d at 959; *see also Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (ALJ considered the claimant's work history and his admission that he left his job for reasons other than his alleged impairment); *Drouin v. Sullivan*, 966 F.2d 1255, 1259 (9th Cir. 1992) (ALJ did not err in considering that, "according to [the claimant's] own testimony, she did not lose her past two jobs because of pain").

The ALJ noted that, overall, Plaintiff had a poor work history.   (AR 29.)   The record reflects Plaintiff engaged in full-time work for only a few years in the late 1990s and early 2000s. Although Plaintiff reported she stopped working in 2002, there was also evidence that Plaintiff admitted to a drug and alcohol problem in 2002, suggesting that the reason she stopped working

1    was not due to her mental or physical impairments, but was due to addiction issues.  The breadth

2    and scope of Plaintiff's employment and the reasons she stopped working in 2002 were relevant to

3    assessing the credibility of her statements that she is unable to work at this time because of her

4    physical and mental limitations.  It is also relevant to Plaintiff's overall veracity.

5             **3.    Criminal History**

6             The ALJ additionally considered Plaintiff's criminal history.  An ALJ may rely upon a

7    claimant's convictions for crimes of moral turpitude as part of a credibility determination.

8    *Albidrez v. Astrue*, 504 F. Supp. 2d 814, 822 (C.D. Cal. 2007) ("convictions involving moral

9    turpitude . . . are a proper basis for an adverse credibility determination"). Plaintiff contends the

10   ALJ failed to explain how Plaintiff's past alcohol-related offenses diminished her overall

11   credibility.  Plaintiff's criminal history is not relevant simply because she has one.  Rather, as Dr.

12   Latter noted during her examination, Plaintiff made inconsistent statements about her criminal

13   history.  Specifically, Dr. Latter noted that Plaintiff initially denied any legal history, but later

14   admitted she had been arrested a few times and had been to jail approximately 10 times and had

15   served up to a year in jail.  (AR 384).  This is dramatically inconsistent testimony about Plaintiff's

16   criminal history which the ALJ was entitled to consider during the course of her psychological

17   evaluation.  (AR 29, 384.)

18            **4.    Daily Activities**

19            The ALJ found Plaintiff's symptom testimony inconsistent with the breadth of her admitted

20   daily activities.  When the claimant spends the day "engaged in activities that are transferable to a

21   work setting, a finding of this fact may be sufficient to discredit a claimant's allegations of

22   disabling impairment." *Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 600 (9th Cir. 1999)

23   (citing *Fair*, 885 F.2d at 603).  For example, a claimant's ability to cook, clean, do laundry, and

24   manage finances may be sufficient to support an adverse finding of credibility.  *See Stubbs-*

25   *Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d

26   676, 681 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional.  She is able to

27   care for her own personal needs, cook, clean, and shop.  She interacts with her nephew and

28   boyfriend.  She is able to manage her own finances . . . . ").  Similarly, an ALJ may conclude "the

severity of . . . limitations were exaggerated" when a claimant exercises, gardens, and participates in community activities. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009). Nonetheless, if the ALJ discredits a claimant's statements based on inconsistent daily activities, the ALJ is required to elaborate on which daily activities are found to conflict with which part of the claimant's testimony. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014). Moreover, it is not the role of the reviewing court to identify inconsistences between a claimant's lay testimony and a claimant's activities that the ALJ did not discuss in the first instance. *Id.* The court is instead constrained to review the reasons the ALJ articulated. *Id.* (quoting *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

Here, the ALJ did not meet the particularity requirement under *Burrell* for assessing any discrepancy between Plaintiff's lay testimony about her symptoms and her daily activities. The ALJ states only that Plaintiff engages in a wide range of daily activities, but does not acknowledge those activities or with what lay statements they conflict. This does not meet the requisite clear and convincing standard under *Burrell*.

Any error in assessing Plaintiff's daily activities, however, was harmless because the ALJ stated other sufficiently clear and convincing reasons to reject Plaintiff's lay statements including Plaintiff's multiple inconsistent statements, her work history, and inconsistent statements about her criminal history. *See Tonapetyan*, 242 F.3d at 1148; *see also Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (error is harmless where it is inconsequential to the ALJ's ultimate nondisability determination).

**D.     The ALJ's Assessment of Third-Party Lay Statements Was Legally Sufficient**

Plaintiff claims the ALJ improperly rejected the lay observation made by a claims representative who assisted Plaintiff with completing her social security application and lay statements from Plaintiff's niece, Ms. Sanchez.

Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). The Ninth Circuit has held that competent lay witness testimony cannot be disregarded without comment, *id.*, and that to discount it, the ALJ "must give

1  reasons that are germane to each witness."  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

2  However, "[w]here lay witness testimony does not describe any limitations not already described

3  by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply

4  equally well to the lay witness testimony, it would be inconsistent with our prior harmless error

5  precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se."

6  *Molina v. Astrue*, 674 F.3d 1104, 1117 (9th Cir. 2012).

7      Plaintiff contends it was error for the ALJ to reject the statement of the Social Security

8  claims representative that Plaintiff had difficulty with concentration and with standing and

9  walking.  (AR 274-75).  Plaintiff cites Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at

10 *5, that states an "adjudicator must also consider any observations recorded by SSA personnel

11 who previously interviewed the individual."  At a June 2011 interview in conjunction with her

12 claim for benefits, Plaintiff was noted to have "rambled during the interview and walked with the

13 assistance of a walker."  (AR 274.)  To the extent the ALJ was required to expressly consider these

14 observations and failed to do so, there is no indication such an error was harmful.  The limitations

15 for concentration and having to use a walker to ambulate were limitations Plaintiff asserted and

16 the ALJ considered in evaluating the medical evidence and Plaintiff's lay statements.  *See Molina*

17 *v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012) (harmless error in failing to consider third-party

18 testimony where that testimony described the same limitations as the plaintiff herself described –

19 which were discussed at length and properly rejected).

20      Although the ALJ disregarded Ms. Sanchez' statements in part because she did not see

21 Plaintiff on a frequent basis, Plaintiff contends this is incorrect as the evidence establishes Ms.

22 Sanchez often drove Plaintiff to her medical appointments and other errands and saw her every

23 weekend.  Such testimony indicates Ms. Sanchez was "greatly involved" in Plaintiff's care.  (Doc.

24 16, p. 22.)  The Commissioner contends Ms. Sanchez' relatively limited contact with Plaintiff was

25 a germane reason to reject her testimony.  The ALJ also noted that Ms. Sanchez stated Plaintiff

26 could not go out alone, but Plaintiff testified she used public transportation by herself to attend a

27 consultative examination, and it was noted at her examination with Dr. Latter that she could

28 complete a questionnaire without difficulty.  (Doc. 17, p. 14.)

1      The ALJ was entitled to discredit Ms. Sanchez' testimony because Ms. Sanchez did not see

2  Plaintiff on a daily basis.  This is a germane reason to disregard her observations about Plaintiff's

3  day-to-day functioning.  While Dr. Latter noted Plaintiff could complete a questionnaire without

4  difficulty, Plaintiff argues there is no evidence of complexity in the form she completed in Dr.

5  Latter's office.  Ms. Sanchez testified Plaintiff was unable to complete paperwork, but because

6  there was no comparison of the types of paperwork or questionnaires Plaintiff could complete, this

7  is not a germane basis to disregard Ms. Sanchez' statements.  The fact Plaintiff was able to

8  concentrate to complete paperwork at Dr. Latter's office, while Ms. Sanchez stated Plaintiff could

9  not complete *any* paperwork (AR 258) is a facial inconsistency between Ms. Sanchez' testimony

10  and Plaintiff's observed abilities.  Although the degree of difficulty of the paperwork Ms. Sanchez

11  stated Plaintiff could not perform was not assessed, she nonetheless stated Plaintiff could not

12  complete any paperwork.   Based on her abilities demonstrated in Dr. Latter's office, the ALJ was

13  entitled to infer that Plaintiff is not unable to complete *any* paperwork as stated by Ms. Sanchez.

14  In other words, it was rational for the ALJ to implicitly conclude Ms. Sanchez' statements were

15  exaggerated for this reason, and this constituted a germane reason to reject her written statements.

16      In sum, the ALJ stated germane and specific reasons to reject Ms. Sanchez' testimony.  The

17  fact Plaintiff articulates another rational interpretation of the statements and the evidence is not

18  controlling and does not afford this court a basis to second-guess the ALJ's assessment of the lay

19  testimony.

20                    **VI.   CONCLUSION**

21      After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the

22  record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore

23  AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant

24  Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff.

25

26  IT IS SO ORDERED.

27  Dated:  __September 11, 2015__         __/s/ Sheila K. Oberto__

                                      UNITED STATES MAGISTRATE JUDGE

28